(No. 27619.—

WILLIAM C. KARLSON *et al.,* doing business as Lamson Bros. & Co., Appellees, *vs.* FRANCIS B. MURPHY, Director of Labor, Appellant.

*Opinion filed September 19, 1944.*

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, of Chicago, of counsel,) for appellant.

MOSES, KENNEDY, STEIN & BACHRACH, (WALTER BACHRACH, and ROBERT C. KELSO, of counsel,) all of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

This appeal presents for construction paragraphs (1) and (2) of subsection (g) of section 2 of the Unemploy-

ment Compensation Act, declaring that the term "wages" shall not include:

"(1) On and after January 1, 1940, that part of the remuneration which, after remuneration equal to $3,000.00 has become payable to an individual by an employer with respect to employment during the calendar year 1940, becomes payable to such individual by such employer with respect to employment during 1940; and

"(2) That part of the remuneration which, after remuneration equal to $3,000.00 has been paid to an individual by an employer with respect to employment during any calendar year occurring after December 31, 1940, is paid to such individuals by such employer with respect to employment during such calendar year. This paragraph and the preceding one shall apply only to Section 18 of this Act." (Ill. Rev. Stat. 1943, chap. 48, par. 218.)

Section 18(a)(1) ordains that contributions shall accrue and become payable by each employer for each calendar year in which he is subject to the act, the contribution to be paid quarterly.

The principal question presented for decision is whether six successive partnerships engaged in the securities business in Chicago, known as Lamson Bros. & Co., are a single employer, within the contemplation of the foregoing provision. From January 1, to September 2, 1940, the partnership consisted of fourteen members. On the day last named, Lamson died and the surviving partners succeeded to the business and organization. The firm continued its business at the same location and transacted the same type of business. The thirteen survivors acquired Lamson's interest under the provisions of a clause in the partnership agreement relating to the death or withdrawal of a member. Upon the death of Lamson, his interest in the partnership property and profits was computed and the amount so ascertained paid to his estate. The continuation provisions read:

"The said copartnership shall not cease upon the death or withdrawal of any of the parties hereto, but the surviving or remaining members shall as soon as possible determine, by audit or certification of a certified public accountant, the copartnership interest of the estate of the deceased partner or of the withdrawing partner, the interest in the assets, if any, to be determined as of the date of death or withdrawal and the interest in the earnings to terminate with the last monthly accounting preceding such death or withdrawal. As soon thereafter as possible, upon the presentation of certified copies of letters of administration by the duly appointed legal representatives of the estate in the case of the death of a partner, and in any event not later than ninety (90) days after the death or withdrawal of any partner, except at the request of said duly appointed legal representatives in the event of death of any partner, fifty per cent (50%) of his capital interest shall be paid to such estate by the surviving partners or to the withdrawing partner by those remaining. Twenty-five per cent (25%) shall be paid to the said estate or withdrawing partner six (6) months from the date of the death or withdrawal of said partner, and the balance of the capital interest, namely, twenty-five percent (25%) shall be paid not later than one year and six months from the date of the death or withdrawal of said partner."

The second partnership continued until December 31, 1940, when three members withdrew. The third firm of ten members was in existence from December 31, 1940, to June 30, 1941, when one of the members retired. Life of the fourth partnership was but twelve days, expiring on July 12, 1941, when one of the partners died. The fifth partnership, consisting of eight members transacted business from July 12 to December 3, 1941, when one of its eight partners died. The sixth partnership of seven members continued in business for the remaining twenty-eight days of the year 1941. For the years 1940 and 1941, Lam-

son Bros. & Co. paid contributions with respect to wages of persons in its employ as if it were a single continuous "employing unit." The firm, as constituted from time to time, claimed that it was not required to pay contributions for the third and fourth quarters of 1940 and 1941 on the portion of wages of their employees in excess of $3000.

After Lamson's death, the Division of Placement and Unemployment Compensation of the Department of Labor took the view that the first partnership described was no longer an employing unit, within the meaning of section 2(g), and that the second partnership was a new employing unit. As a result of this action of the Department of Labor and its refusal to treat Lamson Bros & Co. as the same employing unit before and after Lamson's death, the second firm paid $665.42 as a "contribution" which it would not have been compelled to pay had Lamson Bros. & Co. been treated as the same employing unit throughout the year 1940. The second firm filed a claim for refund for $665.42. Similarly, upon the retirement of three members at the end of 1940, the Department treated the third firm as a new employing unit. Again, as of July 1, 1941, the fourth partnership was treated as a new unit, and as of July 13, 1941, the fifth firm was deemed a new employing unit. The sum of $96.43 represents the amount of contribution which the fifth firm paid as the result of its inability to avail itself of the limitation upon the amount of contributions to be made by employers annually, as provided in sections 18 and 2(g)(1) of the statute. The amount involved, so far as the sixth and last firm is concerned, is $385.72. Refunds amounting in the aggregate to $1147.57 were thus sought by the second, fifth and sixth firms. The claims were consolidated for the purpose of hearing and decision. The Director disallowed all the claims. Thereafter, plaintiffs, the members of the second, fifth and sixth partnerships, filed a protest and a petition for hearing. The Director's representative found that, in

1940 and 1941, Lamson Bros. & Co. consisted of six distinct partnerships, each becoming an employer by reason of its succession to the organization and business of its predecessor; that each partnership was a distinct employing unit from its predecessor and, consequently, a distinct employer from its predecessor; that no one of the partnerships was entitled to make deductions for wages in excess of $3000 paid to an individual during either of the calendar years 1940 and 1941 where any portion of the amount so deducted was not paid by the particular partnership, but, instead, paid by one of its predecessors within the same calendar years. Accordingly, the recommendation was made that the determinations of the Director of Labor denying the three claims for refund be affirmed. Plaintiffs' objections interposed to the report of the representative were overruled and the report adopted as the decision of defendant, the Director of the Department of Labor of the State. The circuit court of Cook county, upon a writ of *certiorari* sued out by plaintiffs, set aside the decision of the Director and rendered judgment in favor of plaintiffs and against defendant for $1147.57. Defendant prosecutes this appeal.

To obtain a reversal, defendant makes the contention, among others, that each new partnership created by the withdrawal or death of a partner is a separate and distinct "employing unit" and "employer," as defined by the Unemployment Compensation Act, and that, therefore, the successive partnerships cannot be treated as a single unit for the purposes of availing themselves of the $3000 limitation set forth in section $2(g)(1)(2)$. To sustain the judgment, plaintiffs maintain that, under the statute, an employing unit consisting of a copartnership remains and continues the same throughout the calendar year, irrespective of the death or retirement of any partner, where the articles of partnership, as here, contain a clause providing that upon such death or retirement the copartnership shall

not cease but, instead, the firm shall be continued by the surviving or remaining members. The parties have also argued extensively the question as to whether the continuation provisions in the partnership agreement, under the Uniform Partnership Law in force in this State, operated to prevent the termination of the partnership during 1940 and 1941 upon the death or withdrawal of individual partners. It becomes unnecessary to consider this contention for the reason that the question of whether the benefits of section $2(g)(1)(2)$ are available to plaintiffs must be determined from the provisions of the Unemployment Compensation Act itself, and the terms employed in this statute must be construed in the light of the general purpose of the act.

If each successive partnership be considered as a separate and independent employer, plaintiffs are, of course, not entitled to the refunds awarded them. If on the other hand, the terms "employer" and "employing unit," employed in the statute, are construed in an economic rather than in a technical legal sense, they are entitled to the relief afforded by section $2(g)(1)(2)$ to those satisfying its requirements. Illustrative of the application of the statute urged by defendant is the situation where an employee receives wages from a partnership firm consisting of fourteen members in the amount of $5000 for the first six months of 1941 and, upon the retirement of one of the members, receives wages amounting to $5000 for the last six months from the firm then composed of thirteen members. Each of these two firms, according to defendant, must pay contributions on the employee's wages to the amount of $3000. Had there been no change in personnel during the year 1941, the first firm would have paid contributions on the employee's wages of $10,000 to the amount of $3000. In determining whether this interpretation shall prevail, resort to familiar canons of statutory construction is desirable.

The primary purpose of construing a statute, the purpose to which others must yield, is to arrive at the legislative intent and render it effective. Again, legislative intention must be deduced from a view of the entire statute and of every material part of it taken and construed together. A particular portion of an act is often designed to extend, qualify or limit another provision so that its meaning may well depend upon the effect of another part or section. (2 Lewis' Sutherland on Stat. Const. (2d ed.) sec. 368.) Since a statute is enacted as a whole and not in parts, each part or section should be construed in connection with every other part or section. (*Inter-State Water Co.* v. *City of Danville,* 379 Ill. 41.) In ascertaining this intent, not only the language employed but the objects to be attained and the evils, if any, to be remedied, must be considered. (*Schoellkopf* v. *DeVry,* 366 Ill. 39.) If a statute admits of two constructions, one of which renders the enactment reasonable and salutary while the other renders it mischievous, if not absurd, the latter construction should be avoided. (*Inter-State Water Co.* v. *City of Danville,* 379 Ill. 41; *Burke* v. *Industrial Com.* 368 Ill. 554.) Again, since ascertaining the intent and rendering effective the intent so ascertained is all-important, a situation within the object, spirit and meaning of a statute is regarded within the statute. Conversely, a situation within the letter is regarded as without the statute unless also within its intent. *People ex rel. Simpson* v. *Funkhouser,* 385 Ill. 396; *U. S. Industrial Alcohol Co.* v. *Nudelman,* 375 Ill. 342; *Burke* v. *Industrial Com.* 368 Ill. 554.

Section 2(d) of the Unemployment Compensation Act (Ill. Rev. Stat. 1943, chap. 48, par. 218,) defines an "employing unit" as any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company or corporation which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within

this State. By the next sentence, all individuals performing services within Illinois for any employing unit which maintains two or more separate establishments within the State are deemed to be employed by a single employing unit for all purposes of the act. Paragraph (1)(A)(B) of subsection (e) of the same section defines "employer," with respect to the years 1937, 1938, and 1939, as any employing unit which has or had in employment eight or more individuals on some portion of a day within each of twenty or more calendar weeks, and, for the year 1940 and thereafter, six or more individuals. Paragraph (2) of subsection (e) provides that any individual or employing unit which succeeded to the organization, trade or business of another employing unit which, at the time of such succession, was an employer shall be deemed an employer. It is further ordained that "employer" means any individual or employing unit which succeeded to the organization, trade or business of any distinct severable portion of another employing unit, which portion, if treated as a separate employing unit, would have been, at the time of the succession, an employer under paragraph (1). Paragraph (3) of subsection (e) declares that any individual or employing unit which succeeded to any of the assets of any employer or to any of the assets of a distinct severable portion, as previously described, by any means whatever, otherwise than in the ordinary course of business, shall be considered an employer unless and until it is proved that three specified conditions co-exist, namely, that the successor unit has not (1) assumed and (2) acquired a substantial amount of the predecessor unit's good will and (3) continued or resumed a substantial part of the business of the predecessor unit in the same establishment. Again, paragraph (4) provides that "employer" also means any individual or employing unit which succeeded to the organization, trade or business, or to any of the assets of a predecessor unit, if the experience of the successor unit

subsequent to such succession plus the experience of the predecessor unit prior thereto, both within the same calendar year, would equal the experience necessary to constitute an employing unit an employer subject to the act under paragraph (1). Paragraph (5) of subsection (e) provides that any employing unit which, together with one or more employing units, is owned or controlled, directly or indirectly, by legally enforceable means or otherwise, by the same interests or which owns or controls one or more employing units directly or indirectly, by legally enforceable means or otherwise, and which, if treated as a single unit with such other employing units or interests or both, would be an employer under paragraph (1), is to be deemed an employer. Section 18(c)(6) provides that for the purpose of determining contribution rates, two or more employing units which are parties to or subject of a merger, consolidation or other form of reorganization effecting a change in legal identity or form, shall be considered and treated as a single employing unit, provided that the specified conditions are satisfied.

The definition of "employer" in terms of an "employing unit" manifests the legislative intent that technical legal definitions of the word "employer" are not applicable to cases arising under the statute. The fact that, under the Uniform Partnership Act (Ill. Rev. Stat. 1943, chap. 106½,) the six successive partnerships involved in this cause may be deemed separate and distinct firms, and, technically, even separate and distinct employers, is immaterial since the words "employing unit" express the intention of the General Assembly to deal with realities by taking cognizance of economic and business considerations. In short, the terms "employing unit," "employer" and "employee," as used in the Unemployment Compensation Act, differ from common-law concepts and from the commonly accepted connotations of these terms. (*Lindley* v. *Murphy, post,* p. 506; *Zehender & Factor, Inc.* v. *Murphy,* 386

Ill. 258; *Peasley* v. *Murphy*, 381 Ill. 187; *Miller, Inc.* v. *Murphy*, 379 Ill. 524.; *Unemployment Compensation Commission of North Carolina* v. *Jefferson Standard Life Ins. Co.* 215 N. C. 479; *National Labor Relations Board* v. *Wm. Tehel Bottling Co.* 129 Fed. 2d 250; *National Labor Relations Board* v. *Colten,* 105 Fed. 2d 179; *In re Zeits,* 108 Ind. App. 617; *Godsol* v. *Unemployment Compensation Com.* 302 Mich. 652.) The power of the General Assembly to broaden or restrict common-law concepts is generally recognized. (*New York Central Railroad Co.* v. *White,* 243 U. S. 188.) In the *North Carolina case,* the court observed: "An examination of the pertinent definitions in the Unemployment Compensation Act makes it readily apparent that such words as 'employment,' 'employer,' 'employing unit,' 'wages,' and 'remuneration,' when used in the act, are not used as words of art having rigid, precise and restricted meanings, but rather, as defined by the act itself, are used as broad terms of description, evidencing a legislative intent to give to the act, a broad and liberal coverage to the end that the far-reaching effects of unemployment may be alleviated. * * * The scope and purpose of the present act are exceptional in breadth. The draftsmanship of the definition section, which gives flesh and sinew to the whole, shows a carefully considered and deliberate purpose to leap many legal barriers which would halt less ambitious achievements. * * * Although the extent of the area encompassed by some of the definitions may cause surprise, the duty of this court is to expound and to interpret the law as it is given to us, not to redraft it along lines which may seem to us more conservative and more desirable." Similarly, "employer," in our statute, is so defined as to demonstrate that it is used in an economic or business sense.

In *National Labor Relations Board* v. *Colten,* 105 Fed. 2d 179, a cease and desist order was entered against a

partnership. Thereafter, Colten, one of the two partners, died and the contention was made that the continuing business, as carried on by Colman, the surviving partner, constituted a new employer. The Circuit Court of Appeals for the Sixth Circuit rejected this contention, saying: "It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace. The term 'copartners' may not then be regarded as more than a term of description, or as denoting a legal entity which alone is subject to the command of the order. It needs no demonstration that the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law. brings about change of ownership in the. employing agency." The quoted observation applies with like force here. To the same effect is *National Labor Relations Board* v. *Wm. Tehel Bottling Co.* 129 Fed. 2d 255.

Sections 2(d), 2(e)(1)(B), 2(e)(2) and 2(e)(5), among others, define "employer," under certain conditions so as to include several employing "units," and to include two or more separate corporate entities, if owned and controlled directly or indirectly by the same interests. By these provisions, the General Assembly has made it abundantly clear that enterprises or units which economically and in reality constitute but a single business shall be deemed a single employer, familiar rules of corporation law, partnership law and the law of master and servant to the contrary notwithstanding. Recourse to the first sentence of subsection (d) of section 2 discloses that the words "any * * * type of organization" apply to the seven members of Lamson Bros. & Co. who were members of each of the six firms engaged in the brokerage business in 1940 and 1941. This group of seven partners transacted business, and for all practical purposes, so far as the public, the State, creditors, customers, and its employees were con-

cerned, was the same business unit throughout the years 1940 and 1941, irrespective of deaths and withdrawals of individual members.

The affiliation clause (section 2(e)(5)), the successor clauses (section 2(e)(2)(3)(4)), and the inherited experience rating clause (section 18(c)(6)), previously summarized, fortify our conclusion that the words "employing unit" are used in an economic and business sense. These clauses deal with matters of substance rather than form. We have recently announced that portions of section 2 were enacted to afford a high degree of security to those involuntarily unemployed by preventing corporate employers otherwise subject to the act from dividing a business having the required employment experience to bring it within the statute into smaller units, each employing less than the number of persons necessary to bring such corporations under the act, but together employing a sufficient number for this purpose. (*Moriarty, Inc.* v. *Murphy, ante,* p. 119; *McGrew Paint and Asphalt Co.* v. *Murphy, ante,* p. 241; *Zehender & Factor, Inc.* v. *Murphy,* 386 Ill. 258.) To accomplish the ameliorative purposes of the law, whether section 2(e)(5) or section 18(c)(6) be involved, the statute refers not only to the employer-employee relationship but defines "employers" in terms of "employing units." To remove all doubt that the wholesome objectives of the statute would be effectuated, the "affiliation," "successor" and "inherited experience rating" clauses were included. Manifestly, the General Assembly did not intend the meaning of the words "employing unit" to be dependent upon the legal form of the economic or business unit for whom the employee rendered service.

The broad scope of the term "employing unit," as defined in section 2(d), expresses the intent that an employing unit shall be any type of individual or association or interest or estate, as well as the legal representative of a deceased person. The terms "trust" and "estate," in-

cluded within the definition of the term "employing unit," furnish additional evidence of the intent of the legislature to use the expression in an economic or business sense. In strict contemplation of law, neither a trust nor an estate could be an employer but can, of course, be an employer in a practical or business sense. An aid in ascertaining the sense in which the term "employing unit" is used is found not only in the definitions of inclusion but also in those provisions such as subsection (f)(6) excluding various services from the term "employment." By subparagraph (G) of paragraph (6) of subsection (f) of section 2, service in the employ of a community chest or foundation is generally not included within the term "employment." A community chest, fund, or foundation may, however, be an employing unit if, by its activities, it amounts to a business. This provision supplies further support for the conclusion that the term "employing unit" is used in an economic or business sense. The legislative intent expressed in many provisions of the statute, the general purpose of the act, the liberal construction to be accorded it, among other reasons, impel the conclusion that the word "partnership," as a "type of organization" is not necessarily terminated as an employing unit each and every time a partner dies, retires or departs to enter the service of the United States, simply because under the Uniform Partnership Act, a dissolution might occur in each instance. The enumeration of types of organization in section 2(d) is merely descriptive of business enterprises which may not, by reason of their legal nature, escape the provisions of the act. We hold that, entirely apart from the effect of the changes in personnel of Lamson Bros. & Co. in 1940 and 1941, under the Uniform Partnership Act, caused by the deaths and retirements from time to time of seven members of the firm, as constituted on January 1, 1940, Lamson Bros. & Co. was, during the two years in controversy, but a single employing unit and, consequently, a single employer.

450

A final observation merits mention, namely, that if contributions must be paid several times on wages paid to an employee because of changes in the membership of a partnership, the increased burden upon employers gives no corresponding benefit to the employees. Apparently, the only benefit accruing in a case of this character is additional revenue which results in an increase in the reserve fund provided for by the act. It is now definitely settled that our Unemployment Compensation Act is not a revenue law, and, it follows necessarily, contributions are to be exacted solely for the purpose of providing unemployment compensation benefits to the unemployed.

Defendant also places reliance upon rulings of a federal administrative agency, namely, the Bureau of Internal Revenue. It is elemental that the rules of administrative agencies concerning the status of employers, within the purview of unemployment compensation acts, are not binding upon the courts. *Oak Woods Cemetery Ass'n v. Murphy,* 383 Ill. 301.

The judgment of the circuit court of Cook county is right, and it is affirmed.

*Judgment affirmed.*